Good morning. You are Mr. Sterling, is that right? No, that's the last case. I'm Mr. John Malgren, Your Honor. Okay, sorry about that. Oh, yeah. Okay, go ahead. Good morning, Your Honors, and may it please the Court, John Malgren on behalf of Plaintiff Appellants WildEarth Guardians et al. I'm joined at counsel's table by Stuart Wilcox. I intend to reserve approximately five minutes for rebuttal. Okay. This morning I'd like to start by discussing a common theme from the briefing relevant to all three claims before moving into spending the majority of my time discussing, first, why the Forest Service's extensive allowance of motorized big game retrieval on Arizona's Kaibab National Forest violates the travel management rule, second, why the three travel management plans violate the National Historic Preservation Act, and third, time allowing, I'll discuss why each of the three travel plans required an environmental impact statement under the National Environmental Policy Act. So first, the Forest Service, throughout its answering briefing, repeatedly argues that because the three travel management decisions at issue here reduce the overall effects from the status quo by prohibiting cross-country travel, except for motorized big game retrieval, that the three travel management decisions comply with the travel management rule NHPA and NEPA. Is your client's object to do away with big game hunting in a national forest? No, Your Honor, and they've been clear throughout the administrative process. They don't object to big game hunting or hunting of any kind, and they don't object to all motorized big game retrieval. What they object to is a designation of motorized big game retrieval that essentially opens up the entire forest to off-road travel. And so they're trying to, through this litigation, put some constraints on it as we believe is required by the law. Your view of the law is that it requires that there be specific designated places for big game retrieval? Yes, Your Honor, to some degree. And so why don't we just dive right into the travel management argument. And so the travel management rule generally prohibits cross-country, meaning off-road travel. You're fine with that? Yes, Your Honor. But there are limited exceptions for a variety of things where people can drive off of roads to engage in certain activities. At issue here is the motorized big game retrieval provision. And the travel management rule is clear that the Forest Service can only do that in a limited manner off of certain roads, and it must employ it sparingly. And so here, additionally, it can only be to retrieve legally harvested big game carcasses. It can't just be for anything. You just happen to see an elk and you shoot it outside the season. You concede that motorized retrieval is necessary in the case of elk and bison? I don't think generally it's not required to pack out a harvested animal. A number of individuals, and the record is clear, a number of individuals don't engage in motorized big game retrieval. Is it reasonable for the Forest Service to allow motorized vehicles to transport big game? Yes, if it's limited and otherwise complies with the law. So you do not contest, as Judge Hawkins just asked, that the rule is not violated because? You don't think the rule is violated because they allowed motorized travel, motorized vehicle to retrieve big game? We don't dispute that. We dispute how it was done on the three roads. You started off by saying that the other side made a mistake by, in effect, comparing the status quo ante to what would occur after the rule. I think that's a correct statement of our NEPA law. Is that a correct statement of our APA law? I think it would depend on the corresponding statute that we're talking about. I think generally when we're talking about impacts on the environment, a reduction of effects does not mean? Right, but we're not talking about impacts on the environment under the APA. We're talking about compliance, whether or not you acted in an arbitrary and capricious fashion. And so why isn't that a responsible consideration in a case in which the overlying rule wants to reduce travel off-road? Sure. I don't think that it is in and of itself unreasonable to consider that, but it's a first step in the analysis. So they argue it, and I guess your point is it doesn't win the case for them, but it helps them. What difference does it make, counsel, that in each of the forests involved here, there was a substantial reduction in the number of miles of roadway? Doesn't that go to the, in quotes, limited factor? So those limits don't extend to the motorized big game retrieval designation. What I mean by that is, yes, there was a reduction in the total mileage of roads on each ranger district. However, when you still look at the effect of the designation, and I think the maps that we included in the briefing and from the excerpts of record really illuminate, even with that reduction, the forest is still almost entirely open. You know, for example, the record shows that on the North Kaibab Ranger District, 97% of non-wilderness lands lie within one mile of a road. And so even when you're reducing the mileage, so even if you, an example, say you eliminate a particular road, Road A, from being open, that road, however, is still open for the purposes of motorized big game retrieval because an individual could cross that area to retrieve their big game. And so it's not just a matter of, oh, we've reduced mileage, so we're reducing impacts, and it doesn't matter for motorized big game retrieval. All these areas are still largely open to that practice. Do you have any case law that construes the statute in the way that you do? To my knowledge, related to motorized big game retrieval, this is it, Your Honor, the district court opinion here. Well, there's no statutory mandate here with respect to travel management, is there? We're dealing with a rule. A rule from the U.S. Department of Agriculture. Right. And so we're not worried about whether or not the plan corresponds with the statute. We're worried about whether the plan corresponds with the rule, correct? For the purposes of? Of your APA claim. Yeah, correct, Your Honor. And so here, you know, each ranger district allows it for one mile off each road, which opens up the entire forest. And so, again, the Forest Service asserts in its briefing that there were certain conditions imposed that it views as the limitations that meet the requirements of the travel management rule, that limited nature of it. Included in this is it's only allowed during hunting seasons, only for certain types of big game, only off roads and not off trails, and that hunters are expected to avoid resource damage. But these arguments either incorporate already existing requirements, so they're not an additional limitation, or are disingenuous in that they're just not a real limitation. An example of that is only allowing this during hunting seasons. The travel management rule is clear that you can only engage in motorized big game retrieval for a legally harvested big game animal, meaning that it was taken during a designated hunting season. What about the limitation of types of animals? Was there such a limitation before? In the past, there was no regulation on the motorized big game retrieval. And so here, it is only allowed for elk on all three ranger districts, plus bison on the North Kaibab ranger district. Is the restriction with respect to the – and I understand it's not an enormous restriction, but there are some roads that are no longer – from which you can no longer travel to pick up game, correct? There are certain roads that were closed. That were closed. Correct. So that is a reduction. That does limit as opposed to the prior situation, does it not? Yes, but again, I think that that largely doesn't matter because of the fact that you can still travel off one mile from any open road. Well, is that true? I'm trying to figure that out. If you have more than a mile of road closed down and you're at the end of that road and you take an animal, I don't see any way that you could get from – you could legally get there with a motorized vehicle to pick it up. Am I mistaken in that? So, Your Honor, how it works is you have a road and the roads are open. And so it really doesn't matter if that road is closed because to retrieve the big game animal, you travel off the road. So you think you can retrieve a big game animal within one mile of a closed road? If it's also within one mile of an open road. That's my question. Isn't there a substantial area where within one mile of a closed road is not within one mile of an open road? No, and I think that's what those maps indicate. On the maps in the briefing and in the record, the light blue areas, which is almost the entire picture, are the areas open to motorized big game retrieval. And so that's, I think, my question. So you think it's an insubstantial area where that occurs? Correct, Your Honor. There's plenty of some area just as a matter of mathematics, correct? Correct, yeah. So it's very, very limited. And as the Forest Service admits in the record, it's – on the North Kaibab, for example, 97 percent of the non-wilderness lands lie within that one-mile closed road. Assuming those facts are true, why is it contrary to the rule? Because we're still under APA claim. Why was it arbitrary and capricious for the Forest Service to conclude that what it had done was consistent with the rule? So why it's arbitrary and capricious is that they essentially read out words from the rule. You know, for example, the word certain. If you read the language in the rule, if you just eliminate the word certain, it doesn't need to be there. And that could mean they could designate it off of any road, all the roads. But the U.S. Department of Agriculture used the word certain, and that word has to have some meaning. And we believe that means it has to be a subset of the roads on the forest. What if it just means specified? Well, I still think you run into the problem of is every single open road – But that's a different argument than certain. That must rely on some other part of the rule. Well, I think what the Forest Service argues is that certain can also mean you just have to say what it is. Assume that's right. Assume that's right for a second. If that's right, why is the service arbitrary and capricious in finding that it complied with the rule? So I think you then go to the third word at issue here, which is sparingly, which comes from the preamble. And the Forest Service manual itself recognizes at ER 394 and 431 that you apply MBGR sparingly after you've conducted the site-specific environmental analysis. Does the preamble have any legal effect? It is not a component of the rule itself, but it's certainly persuasive about what the U.S. Department of Agriculture intended in promulgating the rule. Why is that? Why is that? Why is it persuasive? I think it's persuasive because the Department of Agriculture says the USDA expects the Forest Service to apply this sparingly. And then the Forest Service interpreted that in its Forest Service manual providing guidance for how to do or to comply with the travel management rule, and specifically motorized big game retrieval. It says, you know, we will apply this sparingly after we've conducted the requisite environmental analysis. By sparingly, do you mean that what should have been done with respect to each of these forests, that specific maps indicating where you could go off an existing road within a mile and areas where you couldn't, such as where there might be petroglyphs? Right. That would be one example of an approach the Forest Service could take. Another example would be a permitting system so that the Forest Service knew how many people might be engaging in this, could direct them to certain areas, and to avoid certain areas based on the conditions on the ground at that time. Wouldn't you have to, in effect, tell the licensing authorities in Arizona that only in specific areas in these national forests can big game be harvested? Well, so it's not a question of whether an individual... Do you start with a yes or no? No, I don't believe so. I think the state of Arizona sets regulations for hunting, but the Forest Service can't control where that activity can occur. But in your client's world, there would be not this mapping, but a new map that told where you could go off-road and where you couldn't, because you told us at the onset you're not here to outlaw this completely. You thought a more detailed study should be done to protect areas of endangered species, petroglyphs, whatever, right? Exactly. And as part of the travel management process, the forest already produces a map showing the open roads. It doesn't show the corridors, but it could add that detail. So in your client's world, there would be areas where you could not harvest big game at all? No, that's incorrect. It's just the retrieval of the big game. An individual could still go out and hunt and pack it out. Oh, you could harvest, but you have to leave the animal there to rot. No, a number of individuals engage in packing out animals, and in the record where they talk about the number of animals harvested, it explicitly shows that there is a certain subset of hunters who choose to pack out their big game harvest. So you have to hire people to haul it out instead of using a vehicle? Or you can use a non-motorized hand cart, which is what a number of hunters do. A drone, maybe? Excuse me? A drone, maybe? I think there might be some issues with that under the driver. So what's the average weight of an adult male elk? It's over 1,000 pounds. And bison? The same year on. I think it's 2,000 pounds for bison, isn't it? It could be. Yeah. It's very large. In these areas you're talking about, you'd have to chop them up? Yes. Okay. In effect, aren't you, you know, everybody uses these maps now, Google or whatever, and if you go up high, the whole thing's covered. You go down lower, there's more of a spread. It seems like for the benefit of your clients that you've got the overall map, and so everything seems to just kind of blend in together, so it seems like there's no area that is not covered. But the reality is that, for example, in the Williams Forest, you've got, there was 1,460 miles of roadway, now it's 1,114. In the Tuckeson Ranger Forest, you went from 700 miles to 566 and so on. So the reality is, as my colleague has suggested here, if we're understanding you correctly, you are in effect saying we're going to close off significant portions of these forests to big game hunting. And is that not correct? Is that not what you're trying to do? I don't think so, Your Honor. I think we want reasonable restrictions on motorized uses. But reasonable is in the eye of the beholder, is it not? It can't be reasonable in the views of my clients. Let me ask you a different question and see if I can flesh out what your position is. What if this plan were exactly the same as it is now, but the corridors on either side of the roads were a quarter of a mile? Would it comply with the rule in your view? Potentially, but I'm doubtful just in because it's still a broad designation of every single area. Well, that's what I'm trying to figure out, whether or not your objection is to the width of the corridor or the fact that a corridor exists at all. I think it's very specific, Your Honor. I mean, the corridor certainly is huge, and I think if we looked at the map for what a quarter mile would look like, it would certainly close off much more of the forest to that motorized travel. A eighth of a mile. It's the same issue. It's still off of every road. And while it would open up more of the forest that would not allow motorized game retrieval, under our argument about what the rule requires, designating it off every single open road. A thousand yards. I'd respond with the same. Well, it says your argument has to be that it's the corridor that violates the rule, not the size of the corridor. You know, I think there's a lot of factors, but yes, under our argument, we're arguing that designating it off all roads violates the intent and the language. You're really saying that you shouldn't be able to use motorized vehicles at all to recover big game, are you not? No. We just think, and this I think really gets into our NHPA argument as well, we think there needs to be much more analysis about what actually is out there on the landscape. I understand how you want to get there, but the point is, are you not saying that vehicles should stay on the roads, not go off the roads, and if you go off for a thousand yards or whatever, you're going to be violating various rules or acts. Is that a fair statement? I think we're saying that there are certain areas on the forest where motorized big game retrieval is not appropriate. And those areas are anywhere off the road? No. I don't think my client would object if it was a much more limited designation. What amount? You've been asked a thousand yards. You've been asked different. What would be acceptable to you? Well, it's not so much the distance from the road, so much as every single road, and the Forest Service should have an obligation to look at, you know, where does it make sense? Where are people hunting? So they want to close off portions of each forest to big game hunting? To the retrieval of big game. Right, exactly. So you do agree that that's what you're trying to do? Yes, Your Honor. Do you want to save any of your time, counsel? I would, unless Your Honors have any questions about our other two claims. No, thank you. Thank you. Thanks for your argument. May it please the Court. I'm Mark Haig from the Department of Justice. Unlike my colleague in your immigration case, I pushed very hard to be able to get here today because I wanted to enjoy the warm weather in Phoenix. It wasn't so warm this morning. You were deceived. I guess so. But I'm happy to be here. I would like to start with some of the broader context here about the extent to which this action, these decisions limit motorized use on the forest because I think that's very important. The Forest Service, when it was making these decisions, looked at the types of motorized use that have the biggest impact on the forest. And it started with the ones that have the biggest potential impact and eliminated or significantly limited those. So there's no more just general cross-country travel. The off-road camping is limited to specific corridors. And that's a use that does have the potential for impact. Let me just be sure I understand that one point. Is it the Forest Service's position that under at least the current situation, there can be far greater damage by people just wandering off wherever and not within a confined area? Yes. Does that end the analysis? No, I don't think so. Doesn't a lot of our case, at least under NEPA, say we measure the impact of a particular action, not necessarily whether it improves the situation that existed before? Yes, yes. But in doing that, it's important to look at what the baseline is, what the status quo is, and what the agency action is, what the action is actually doing or not doing. Is that true under the NHPA? In other words, when we're looking at the cultural sites and you take an action, don't we look at the impact on particular cultural sites as opposed to cultural sites as a whole? We look at the impact of the undertaking, which is the agency action, and the agency action here greatly restricts the amount of all. No, I understand that. So let me give you a hypothetical that may not be factually accurate, but I think this record is consistent with it. Let's assume you know of a cultural site within one mile of a road that will now be within the corridor. Do you have some obligation to take some minimization actions with respect to the effect of this corridor on that cultural site? I understand that before people were free to trample the cultural site because you didn't have an action at stake. But now you have an action at stake and you know the cultural site is in that one-mile corridor. Do you have some obligation to do more than simply say, well, it's better than it was before? Under the status quo ante, as well as under the rule, there is still its... I'm talking about the NHPA now. Right, under the NHPA, okay. Well, I'm not sure how... Let me make up an example, and I understand I'm making it up. You know there's a grave site of a native tribe. Or petroglyphs. Petroglyphs within seven-eighths of a mile of a road, and that's now within the corridor in which you can travel on. You don't have to map the whole thing. You just know this one is there. Now that you say it's okay to drive motorized vehicles in this one-mile area, must you do more, or is it simply enough that they could have driven over the petroglyphs before? I don't think that it would be lawful to drive over the petroglyphs before. I think apart from any of these decisions, the background rules are when you're traveling on national forest land, when you're visiting national forest lands, you're not allowed to disturb historical... But is there potential for increasing the disturbance of this cultural resource? Because where before you could go wherever and whenever you wanted, now you're stuck within this one-mile corridor. I don't think so, Your Honor, because the effect of this action is not to concentrate use in particular areas. It's just to ratchet down the overall amount of use. I'm frankly surprised at your answer to my colleague's question because if I understood it correctly, he's basically saying right before the action was taken, even though the NHPA was out there, that because people could drive around wherever they wanted to, there was a greater likelihood that there would be damage to petroglyphs or whatever, whereas now for the more limited use within this confined area, plus the fact that people are concentrating on the fact that there are those petroglyphs there, that the likelihood of damage is reduced in some way. You seem to be fighting that. Did I misunderstand you? I may be misunderstanding you, Your Honor. In terms of the issue of concentrating use comes up here in the context of the dispersed camping areas. The new rule allows corridors of 100 feet in some places, off certain segments of the roads in the North Kaibab and the Tusayan Forest, not in the Williams. The Forest Service archaeologists surveyed all of those corridors for archaeological resources and limited those corridors to areas where there are no known archaeological resources. Not what was there before. Yes, that's right. And those corridors in the North Kaibab, it's 200 miles out of the 1,400 miles. So are you saying there's already limitations within this one-mile corridor? The one mile is different. The one mile is for motorized campers. Right. So are there limitations within that one-mile corridor with respect to cultural properties? There's the admonition that hunters are supposed to use the most direct route. They're supposed to avoid disturbing any— Wasn't that a preexisting admonition? Yes, yes, it would have been. It may not be required. I'm just trying to get a factual question straight. Am I correct in saying that no particular restrictions were made as part of this action with respect to cultural properties within the one-mile corridor? The restriction is the wet weather protection because the evidence in the record is that damage to sites, to sites that are on the ground. When we're talking about cultural properties, we can talk about an artifact scatter or it could be an historic ranger cabin. But the artifact scatters, the things that are on the ground, the damage is much more likely to occur when the soil is wet. And under the rules, the district rangers will issue closure orders when soil conditions are too wet and that kind of damage is likely to occur. That's under the proposed rule, right? Yes, yes, that's right. Other than that, did your client make any effort to take into consideration damage to cultural sites that would be enhanced by the allowance of motorized big game retrieval? The agency's view is that the decisions will not increase that kind of damage, that they will reduce it because there will be so much less travel off-road than there was before. But I take it your client did not look at a map and say, these are culturally sensitive areas and we're not going to allow motorized big game retrieval at all in those areas, even if it's within one mile of an existing road. They didn't do that. No, they didn't. I think it's because the areas adjacent to the roads within a half mile or a quarter mile have been significantly surveyed. There's less surveying of the areas that are farther out. But they know that the undiscovered sites on the forest are small and they're widely scattered. And the amount of acreage that's going to be affected by this motorized big game retrieval is a tiny percentage of the total acreage of the forest. So it's less than one-tenth of 1%, 0.06% in the Williams and Toussaint, 0.0099% in the North Kaibab. So it's a vanishingly small percentage of the acreage. And the other factor is that a single trip, one pass in and out, is not the kind of action that is likely to cause significant damage. It's not likely to be in the same place each time? Is that the theory? Yes, and what causes damage to these kinds of resources is repeated use or driving under wet conditions. Can I ask you a question about Exemption Q? There's at least some reference in the record at some point to the fact that some of this activity doesn't really happen. You don't have to worry about it under an HPA because it falls subject to Exemption Q. That's incorrect, isn't it? That's incorrect, yes. So what do we do with that? The final thing, I think we've recognized that the reference to Exemption Q that appears in the Forest Service record is an error. It's in a single response to comments. There are other places in the record, and I've cited them in my brief and included them in the federal supplemental excerpts, where we can see that the agency did, in fact, consult with the Arizona... Which you wouldn't have had to do were it subject to Exemption Q. Right, and the state SHPO, the State Historic Preservation Office, concurred in the finding that this would not have significant impacts on historical resources. Counselor, I want to get back to something you said just a minute ago to contrast that with your opponent. He suggests that the way the new map and retrieval are laid out, that basically the entire forest is subject to, essentially, pillage. You're saying that the totality of these roads and the use of the picking up of the animals includes one-tenth of one percent of the total acreage involved. Is that an accurate statement? It is, but I guess we're both... You know, they're different measures. It's how high you are up on the map, right? No, it's... Mr. Meldrin is correct when he says that most of the forest is potentially open to motorized big-game retrieval. However, in any given year, because the number of motorized big-game retrievals are so small and because it's just a single trip in and out of a total distance of no more than two miles, mile in, mile out, that the actual amount of acreage that will be disturbed in any one year is minuscule. Okay, so the potential is what he's talking about, but the reality, from your perspective, is based on the expertise of the agency, is that a very, very tiny portion will be affected and indeed less than would have been affected before the rule was adopted. Is that right? Yes, yes. And, well, less than that would have been affected before the rule was adopted because now we're talking about fewer species. We're talking about only retrieval, not scouting, not joyriding, not antler gathering. We're not even going out to hunt. Right. You must not use a motorized vehicle to go out to hunt. Hunt first and retrieve later. What does the word sparingly mean in the rule? I think your interpretation of the word certain is probably closer to the dictionary definition than your opponent's, but what does the word sparingly mean? What we argue in our brief is that it's not intended to be a nationwide or regionwide designation. So that as long as it doesn't cover everything, it's sparing? Well, it's sparing right in the context of that whole sentence is that the decisions aren't going to be made forest by forest or district by district. And here the... Well, it says travel use is supposed to be allowed only sparingly or motorized use is only supposed to be allowed sparingly. I don't know. It is sparingly in the sense that it's not complete, but is there any other substance to that word? Well, the way that it is sparingly or limited here, which is the operative word in the rule, not in the preamble, it's limited by species, it's limited by time, it's limited by who can do it, it's limited by distance, it's limited by soil conditions. Counsel, if you want to wrap up your part, I think the state of Arizona wants to have an opportunity to make its presentation as well. Well, I have no more if you have no further questions. No more questions by colleagues? Thank you very much. Thank you. We'll hear from Mr. Dre, I believe. Good morning. Good morning. May it please the Court, I'm Dominic Dre, and with John LeSueur I represent the intervener, State of Arizona. It's worth remembering in all of this discussion that the status quo ante before this agency action was open off-road travel for any purpose. Now it's been curtailed to two limited exceptions, dispersed camping and motorized big game retrieval. That is already a huge change in what's available on the Kaibab National Forest. In some ways, plaintiffs and their cause have already won this issue a long time ago before the agency. A few ways in which the current rule is limited, and I'll try to pick up on where the Court left off, it's limited in species, only bison and elk. The State of Arizona actually requested mule deer to be included as well because there are population control issues around that species, and we were rebuffed in that by the Forest Service. Also bear, mountain lion, pronghorn, none of those are allowed. You're allowed to hunt them. You're just not allowed to transport them. For motorized vehicle retrieval. Yeah, for motorized vehicles. Yes, Your Honor. It's limited by season. It's limited to one trip in and out. You have to be a legal hunter, of course. You're limited to dry conditions. You can't cross creek beds and other riparian crossings except at hardened places. And there's no off-road travel for any purpose in the areas of the forest that are so designated, and there are those areas. Moreover, the Forest Service reduced the total number of roads by 20 to 30% in the hundreds of a percent of the total forest surface area. That is an extremely limited, using the language of the TMR, the travel management rule, that is an extremely limited restriction. I think it's also sparing, even if the preamble were applicable, which it, of course, is not. But to further develop that point on which Judge Hurwitz had asked a question just a moment ago, the language of sparingly says, sparingly to avoid undermining the purposes of the final rule. It's not just sparingly sort of hanging out there in the abstract. It's sparingly in order to avoid undermining the travel management rule's overall purposes. And given how drastically the agency here has reduced the amount of travel on the forest, it's hard to say that they're undermining the rule's purposes. This is ultimately an APA review. And in some ways, this court has already ended the discussion in 2012 in Public Lands for the People, Inc. versus USDA, in which it explained that was a case involving mineral prospecting, but it's the same ultimate statutory hook, 16 U.S.C. 551, in which this court explained that the Forest Service's extensive statutory authority dooms, I believe that's actually this court's word, dooms the challenge, yes it is, before it even began. And that's true here, too. The Forest Service has incredible discretion. Was that a challenge to a rule or a plan? That was a rulemaking challenge. Yeah, that's what I thought. And so it's really probably a different analysis, isn't it? I think it would be an APA analysis in both circumstances. Right, but the question of whether the rule was authorized by the statute is really a different question of whether or not your plan complies with the rule, isn't it? Oh, I think it's the same legal standard. It is a different reference point because now we're talking about compliance with a rule. There we're talking about the rule's compliance with the statute. But the same scope of authority exists for the Forest Service's actions in both cases because it actually, here, too, it's 16551 that's the wellspring. Yeah, and maybe it's not a major point. They're not attacking the rule. They're not saying the rule that was promulgated wasn't promulgated pursuant to statutory authority. They said you made up the rule, we love it, you're just not following it. That is correct, yes, I agree with that description. Additionally, on the subject of certainty, my scouring of dictionaries, which has been sort of extensive over the last few weeks, indicates that fixed and certain is by far the most compelling definition, the most widely used one. The only example I could find, I guess there were two, that sort of indicated the other side's position might be viable. In the Oxford English Dictionary, it's definition A27C, and it says some at least. It's also an obsolete definition of certain, but some at least implies that it could also be all. So I don't think that does much to help. And in the Webster's sort of family of dictionaries, Webster's second says one or some among possible others. Possible others, it could, of course, also include all. But then by Webster's third, that's gone. On that highlight, I'm afraid you're out of time. Let me ask my colleagues, does anybody have additional questions? I've asked some, but not all of the questions. Certainly. And they were certain. Indeed. Thank you. Thank you very much, counsel. So we have a little rebuttal time. Thank you, Your Honors. I'd like to, in my brief time, respond to some of the NHPA argument we just heard. First, the court asked about whether it's illegal for someone to go and run over a cultural site. And I think one of the issues that may be lost here is that a lot of the damage is inadvertent damage. We're talking about people who are driving, and they don't know that they're going over a cultural site. And the record contains a lot of pictures of what this damage looks like. And so I think it's important to remember that people, especially because they haven't conducted the requisite surveys under the NHPA, they don't know where these resources are. In the absence of this rule, what you described was open season, right? It was, Your Honor. And so, you know, here there is a reduction of the impact because the cross-country travel is banned. But importantly, under the NHPA, it requires the Forest Service to look at the effects to any site that may be impacted, any cultural site. And so it doesn't mean, oh, we're reducing it, we have some extra cultural sites to spare here. You know, it really requires them to look, to determine what is out there, where it is, and whether or not they need to do anything to protect it. But counsel, as I think we've all suggested here, it seems like this is, in every respect, better for what your clients are looking for. I mean, everything has been reduced. There's a limitation. Instead of open season, you've got the, I know you want more. But the question is whether this is adequate under the APA and the other processes that we're dealing with here. It's certainly better, Your Honor, than the prior system. We'll admit that. I think especially what I want to focus on here is the NHPA, where the protocol here requires them to go out. And I'd like to quote exactly from it. It says for. We're going to wind up after this. We're going to be out of time. Go ahead. So I just want to quote it. The protocol says the following areas require 100% surveys. Then there's a list of things that qualify. And the very first thing is where site density is expected to be high. And that's not disputed here. They know that there's high site densities. They had a requirement to do 100% surveys, and they chose not to. Thank you very much, Your Honor. Thank you. Thanks to all counsel. Very helpful. The case just argued is submitted. And the Court stands in recess for the day.
judges: Hawkins, M. Smith, Hurwitz